Joseph M. Alioto
**ALIOTO LAW FIRM**
555 California Street, Suite 3160
San Francisco, California 94104
Telephone: (415) 434-8900
Facsimile: (415) 434-9200
Email: JAliotoJr@AliotoLaw.com

John J. Houlihan, Jr. (SBN 30285)
**HOULIHAN LAW**
3401 Evanston Avenue North, Suite C
Seattle, Washington 98103
Telephone: (206) 547-5052
Facsimile: (206) 547-1958
Email: John@Houlihan-Law.com

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| CASSAN ENTERPRISES, INC.; CMC INVESTMENTS, INC., d/b/a Dollar-Rent-A-Car; TODD INVESTMENTS CO., d/b/a Dollar-Rent-A-Car; and JAMES CASSAN, an individual, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> AVIS BUDGET GROUP, INC. and DOLLAR THRIFTY AUTOMOTIVE GROUP, INC., <br><br> *Defendants.* | Civil No.   2:10-cv-01934 |

## <u>COMPLAINT FOR VIOLATION OF THE CLAYTON ANTITRUST ACT</u>

Pursuant to Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26, the

above-named plaintiffs, by and through their attorneys, bring this suit to

preliminarily enjoin, permanently enjoin, and/or obtain divestiture of the
proposed acquisition of Dollar Thrifty Automotive Group, Inc. by Avis Budget
Group, Inc. as a violation of Section 7 of the Clayton Antitrust Act, 15 U.S.C.
§ 18, and complain and allege as follows:

## THE NATURE OF THE ACTION

1.      On October 5, 2010, Avis Budget Group, Inc. ("Avis/Budget")
announced its intention to acquire direct competitor Dollar Thrifty
Automotive Group, Inc. ("Dollar/Thrifty"), which would result in combining
two of four competitors in the United States car rental industry.

2.      The car rental industry has two primary markets, depending on
the location from which customers rent cars: the airport car rental market
and the off-airport or "local" car rental market.  The airport car rental market
accounts for approximately 80% of all revenue derived from car rentals in the
United States.

3.      Just four car rental firms account for 98% of all revenues
generated in the United States airport car rental market.  Avis/Budget is the
second largest firm with 29% market share, operating the Avis (19% market
share) and Budget (10%) brands.  Dollar/Thrifty is the fourth largest firm
with 12% of the market, operating the Dollar (7%) and Thrifty (5%) brands.
The remaining two firms are Hertz Global Holdings, Inc., the third-largest
firm with 26% that operates the Hertz brand, and Enterprise Holdings, the
largest firm with 31% market share that operates the National, Alamo
(combined 21%) and Enterprise (10%) brands.  All other car rental firms
account for a total of only 2% of the market.  (For a graphical depiction of the
market, see attached Exhibits A and B.)

4.     The proposed acquisition of Dollar/Thrifty by Avis/Budget would create the largest airport car rental firm in the United States with 41% of the airport car rental market.

5.     The proposed acquisition would also significantly increase the levels of concentration in the United States airport car rental market and substantially reduce competition by combining the Avis, Budget, Dollar, and Thrifty brands under single ownership.  The combination would increase Avis/Budget's market share from 29% to 41%, increasing the industry's Herfindahl-Hirschman Index ("HHI")[1] by nearly 700 points – from roughly 2630 to 3320 – resulting in an extraordinarily concentrated market and a drastic increase in the combined entity's market power.  (For a graphical depiction of the HHI in the market, see attached Exhibit C.)

6.     The car rental industry in the United States is marked by an increasing rate of market concentration in the past fifteen years.  (For a graphical depiction of the history of consolidation, see attached Exhibit D.)

7.     The significant increase in market concentration that will result from the proposed acquisition is likely to substantially lessen competition, in violation of Section 7 of the Clayton Act by increasing the ability and likelihood that the three remaining market participants will expressly or tacitly coordinate reductions in supply and increases in price, resulting in injury to consumers such as plaintiffs.

8.     As franchisees of Dollar/Thrifty doing business as Dollar Rent-A-Car in Seattle-Tacoma and Portland, plaintiffs are further threatened with

---

[1]     The Herfindahl-Hirschman Index is a measure of market concentration utilized by the Federal Trade Commission and Department of Justice.  According to the government, an HHI of 2500 or greater indicates a "highly concentrated" market.

damage in the form of lost revenues, lost profits, decreases in the values of their businesses as going concerns, and the forced closure of their businesses resulting from exclusionary conduct including, but not limited to, predatory bidding, predatory pricing, diverted rental reservations, increased fees, business harassment and the pre-textual elimination of plaintiffs as franchisees.

## JURISDICTION

9.     This action is brought under Section 16 of the Clayton Act, 15 U.S.C. § 26 to enjoin defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  This Court has jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).

10.     Defendants Avis/Budget and Dollar/Thrifty purchase, sell, and rent cars in the flow of interstate commerce, and the purchase, sale and rental of cars substantially affects interstate commerce.  Defendants Avis/Budget and Dollar/Thrifty purchase, sell and rent cars in and around the Seattle-Tacoma area and therefore transact business and are found in this district.

## THE PARTIES

11.     Defendant Avis Budget Group, Inc. ("Avis/Budget") is a Delaware corporation with executive headquarters in New Jersey.  Avis Budget Car Rental, LLC and its subsidiaries is the primary operating company and wholly-owned subsidiary of Avis/Budget.  The primary operation of Avis Budget Car Rental, LLC is the rental of cars under the Avis and Budget brands, which account for respectively 61% and 32% of

Avis/Budget's revenues.  The Avis and Budget brands rent vehicles at most of the largest airports in the United States and is the second-largest airport car rental firm in the nation, by revenue, with approximately 29% of the market on annual revenues of $5.1 billion.  Avis/Budget employs more than 22,000 people in 6500 vehicle rental locations worldwide and maintains an average rental fleet of approximately 250,000 vehicles, allowing the company to complete more than 23 million vehicle rental transactions annually.

12.     Dollar Thrifty Automotive Group, Inc. ("Dollar/Thrifty") is a Delaware corporation with headquarters in Tulsa, Oklahoma.  Dollar/Thrifty owns Dollar Rent A Car, Inc. and Thrifty, Inc., which owns Thrifty Rent-A-Car System, Inc.  With its Dollar and Thrifty brands, Dollar/Thrifty is the fourth largest operator of airport car rental facilities in the United States with 12% of the market and annual revenues of $1.5 billion.  Dollar/Thrifty employs 6,000 people and operates over 1,550 rental locations in 53 countries worldwide, including approximately 600 locations in the United States and Canada and virtually all of the top United States airport markets. Dollar/Thrifty operates a single fleet of approximately 100,000 vehicles shared by the Dollar and Thrifty brands.

13.     Plaintiff Cassan Enterprises, Inc. ("Cassan Enterprises") is a C corporation in the State of Washington.  It owns a Dollar-Rent-A-Car franchise which it sub-franchises to CMC Investments, Inc.  Cassan Enterprises owns a fleet of rental vehicles which it leases to CMC Investments, Inc. and Todd Investments Co. for the purpose of conducting car rental business.

14.     Plaintiff CMC Investments, Inc. ("CMC") is a C corporation in the state of Washington doing business under the name Dollar-Rent-A-Car

at, among other places, the Seattle-Tacoma International Airport in Seattle, Washington.  CMC Investments is a sub-franchisee and wholly-owned subsidiary of Cassan Enterprises, from which it also leases a fleet of rental vehicles.

15.     Plaintiff Todd Investments Co. ("Todd") is a C corporation in the state of Oregon and franchisee of Dollar/Thrifty doing business under the name Dollar-Rent-A-Car at the Portland International Airport in Portland, Oregon.  Todd Investments leases a fleet of rental vehicles from Cassan Enterprises.

16.     Plaintiff James Cassan is an individual residing in the state of Washington and is a part-owner and president of Cassan Enterprises, Todd, and CMC.  In his personal capacity, Cassan is a regular consumer of airport car rentals and expects to continue to purchase airport car rental services in the future.  Cassan maintains an active account with National car rentals and regularly rents cars from National and Dollar-Rent-A-Car at airport locations throughout the United States.  In the first eleven months of 2010, Cassan rented cars five separate times from airports in Texas, Florida and California.  Cassan rents cars for personal and business purposes.

## THE MERGER AGREEMENT

17.     Between approximately September 30, 2010 and November 9, 2010, Mr. Scott Thompson, President and Chief Executive Officer of Dollar/Thrifty and Mr. Ronald Nelson, Chairman and Chief Executive Officer of Avis/Budget, as well as possibly other representatives of the respective companies, agreed in principle to Avis/Budget's acquisition of Dollar/Thrifty. In order to prevent public knowledge of their agreement, Mssrs. Thompson

and Nelson further agreed among themselves that Avis/Budget would not make a formal tender offer for Dollar/Thrifty shares, thereby avoiding public disclosure requirements under the securities laws and further attempting to thwart plaintiffs from learning of defendants' express agreement and plan to merge.

18.     On October 5, 2010, Avis/Budget and Dollar/Thrifty issued a joint statement that "Dollar Thrifty and Avis Budget have agreed to cooperate with respect to Avis Budget's efforts to pursue antitrust clearance of the proposed acquisition by Avis Budget of Dollar Thrifty."  According to the statement, in order to avoid having to make public statements about the proposed merger, "Dollar Thrifty has requested that Avis Budget not commence an exchange offer at this time."  As a result, the parties announced they "do not intend to make further announcements with respect to this matter unless so required under applicable law."

19.     On November 4, 2010, Avis/Budget's Mr. Nelson told reporters on a conference call that on October 5, 2010, "we affirmed our commitment to pursue an acquisition of Dollar Thrifty," and that "[w]e continue to diligently pursue the proposed transaction."

20.     On November 9, 2010, Dollar/Thrifty's Mr. Thompson publicly released a letter to Avis/Budget's Ronald Nelson in order to "review where things stand and how best to proceed forward."  In the letter, Mr. Thompson referenced Avis/Budget's "commitment to explore a transaction with us on the proposed terms," and pledged to continue to cooperate with Avis/Budget in obtaining antitrust clearance from the government.  Mr. Thompson requested that Avis/Budget not commence an exchange offer for

Dollar/Thrifty shares "at this time" so the parties would not be "subject to substantial disclosure obligations."

## THE RELEVANT MARKETS

21.     The following are relevant markets or submarkets: (1) the airport car rental market in the United States; (2) the airport car rental market at the Seattle-Tacoma International Airport; (3) the airport car rental market at the Portland International Airport; (4) the sale of used "program cars" in the Seattle metropolitan area; and (5) the sale of used "program cars" in the Portland metropolitan area.

### United States Airport Car Rental Market

22.     The car rental industry is made up of two principal markets, the airport market and the "local" market.

23.     The airport market consists of the rental of cars to travelers arriving at the airport by airplane.  Car rental companies competing in the airport market have facilities located on or immediately adjacent to the airport.  Approximately 75% of all car rentals in the United States are airport car rentals.

24.     The "local" car rental market is not at issue in this case.  It consists of the rental of cars to customers who periodically need a vehicle closer to home for personal or business use.  Customers within this market include, for example, those needing a temporary replacement vehicle while their own cars are being repaired.  Car rental companies competing in the local market have facilities located outside the areas adjacent to the airport,

typically in a city downtown area.  Approximately 25% of car rentals in the United States are local car rentals.

25.     Travelers who arrive at an airport and are in need of a rental car cannot reasonably turn to local car rentals as a substitute for airport rentals, because local car rental facilities are located too far from the airport.

26.     There are no reasonably available substitutes for airport car rentals.  Travelers who rent cars at the airport generally do so for the convenience or necessity of ground travel flexibility.  Other forms of airport ground transportation, including buses, taxis, or limousines, are too inflexible or too expensive to reasonably substitute an airport car rental.

27.     Neither the price of local car rentals nor the price of other airport ground transportation significantly constrains the price of airport car rentals.  Consumers of airport car rentals will not reduce their consumption of airport car rentals in response to a small but significant and non-transitory increase in the price of airport car rentals to an extent that would make such a price increase unprofitable.

28.     The public and the car rental industry recognize "airport car rentals" as a separate economic market.  Both defendants in this case have made public statements recognizing the existence of an "airport market."  Companies that rent cars at the airport often require unique facilities, from a rental desk leased from the airport to a specialized parking structure with parking stalls, security barriers, personnel booths, and service areas.  Customers who rent cars often do so only when traveling and only from airport facilities.

29.     The relevant geographic markets are the United States, the Seattle-Tacoma International Airport and the Portland International Airport.

30.     Avis/Budget markets the Avis and Budget brands in every significant metropolitan area in every state in the nation.  Avis/Budget operates the Avis and Budget brands, either through corporate-owned stores or franchisees, at approximately 1,300 locations at most or all of the largest 200 airports in every state in the country, including the Seattle-Tacoma International Airport and the Portland International Airport.

31.     Dollar/Thrifty markets the Dollar and Thrifty brands in every significant metropolitan area in every state in the nation.  Dollar/Thrifty operates the Dollar and Thrifty brands, either through corporate-owned stores or franchisees, at approximately 500 locations at most or all of the largest 100 airports in every state in the country, including the Seattle-Tacoma International Airport and the Portland International Airport.

32.     Hertz and Enterprise Holdings (consisting of Enterprise, National, Alamo brands) market and operate their car rental brands in every state in the nation and at all or most of the largest 100 airports in the United States.

33.     The airport car rental market in the United States consists of four firms that operate eight brands with the following market shares:

- Enterprise Holdings (operating National, Alamo and Enterprise brands) – 31.4%
- Avis/Budget (operating Avis and Budget brands) – 28.9%
- Hertz (operating Hertz brand) – 25.7%
- Dollar/Thrifty (operating Dollar and Thrifty brands) – 12%

34.     The United States airport car rental market is highly concentrated, with an HHI of approximately 2630.  (For graphical depiction of pre- and post-merger HHI in the market, see Exhibit C.)

35.     The barriers to entry into the United States airport car rental market are high and prevent major de novo market entry.  The national car rental business requires a large initial capital outlay, sufficient to obtain and maintain a car rental fleet and rental facilities at all of the major airports, at a minimum.  A de novo entrant would also need the infrastructure necessary to support national operations and marketing, including the ability to purchase and sell its entire fleet annually in order to maintain a new, low-mileage fleet and to fluctuate fleet size with seasonal demand swings.  Even if a potential de novo entrant were able to fund an operation able to compete in the market, structural barriers would effectively prevent entry.  Market participants must have access to a customer service counter, fueling facilities, service areas, parking stalls and other facilities at each airport.  However, these facilities are physically limited at many airports; airports will not undergo new construction to accommodate a single de novo entrant; and incumbent car rental firms would pressure airports into preventing major de novo entry.  Well-funded de novo entrants would also face difficulties building their own facilities on the airport, where land is scarce, airports are unmotivated to lease, the permitting process is lengthy, and zoning laws forbid building refueling stations, which require an underground gasoline tank of approximately 10,000 gallons.  Without the ability to market its products at each of the major airports, even a well-funded potential de novo entrant would be unable to effectively compete in the national airport car rental market.

36.     The car rental industry in the United States has become substantially more concentrated in the past 15 years.  In 1994, Dollar acquired General car rental; then, in 1997, Dollar and Thrifty merged.  Also in 1997, Alamo acquired the Snappy, Spirit, Value, and EuroDollar brands.  In 2001, Avis acquired Cendant and Alamo acquired CarTemps.  In 2002, Avis merged with Budget.  In 2007, Enterprise Holdings acquired both the National and Alamo brands.  And last year, Hertz acquired Advantage.  If the proposed acquisition is consummated, the industry will have gone from sixteen car rental competitors to three in less than two decades.  (For graphical depiction of history of concentration in market, see attached Exhibit D.)

37.     The market for airport car rentals in the United States is a line of commerce and relevant product and geographic market within the meaning of Section 7 of the Clayton Act.

**Seattle-Tacoma and Portland Airport Car Rental Markets**

38.     In order to conduct their business, airport car rental companies need a customer service counter and parking stalls.  They also need access to a Quick Turnaround Area ("QTA"), which allows the companies to clean, service and refuel their fleet vehicles.  A QTA must be built on paved, open-spaced land and have an installed refueling station (including an underground gasoline tank of approximately 10,000 gallons and government-permitted safety mechanisms) and special equipment to clean, vacuum and service the vehicles.  Often, installing a QTA requires special local, state and/or federal permitting.  A QTA must have sufficient space to accommodate the maximum number of vehicles during peak demand periods.

39.     Depending on the physical space constraints of each airport, car rental facilities are generally located in (or immediately adjacent to) the airport terminal, or a distance of miles off the terminal.  Where the car rental facilities are located in or immediately adjacent to the terminal, customers can comfortably walk to the car rental counters and cars from the airport terminal.  Where the car rental counters and/or cars are located off the terminal, customers must take a shuttle bus to the facilities.

40.     Car rental firms with counters and cars located inside or immediately adjacent to the airport terminal have a significant competitive advantage over car rental firms with counters and/or cars located a shuttle-ride from the airport terminal.

41.     At the Portland International Airport, each of the eight major car rental brands is in operation.  Plaintiff Todd, which operates the Dollar brand, is the only independent franchisee in operation; all other brands are operated by the Avis/Budget, Hertz or Enterprise Holdings corporate stores.

42.     In Portland, all eight customer service counters are located in a garage approximately 100 feet from the airport baggage terminal.  However, counter and facility space is severely limited.  As a result, only Hertz, Avis, Enterprise, Budget and Dollar (operated by plaintiff Todd) have counter space inside the heated garage lobby, with their QTAs and cars all located within the same garage.  Thus, customers renting from these five firms walk a very short distance to their cars from the garage lobby.  The other three brands – National, Alamo and Thrifty – have customer service counters outside the heated garage lobby, and their QTAs and parking stalls are located two to three miles away.  Thus, a customer renting from National, Alamo or Thrifty must wait at the unheated customer service counter (winter

temperatures in Portland are commonly in the low 30s in Fahrenheit), then ride a shuttle bus to their cars.

43.     National, Alamo and Thrifty are at a distinct competitive disadvantage in Portland because their service counters are located outside the garage lobby and their cars and QTAs are located miles away from their service counters.  As a result, whereas the market shares of National and Alamo combined is approximately 21% in the United States, in Portland, their combined market share is 13%.  National, Alamo and Thrifty have the lowest market shares in the Portland airport car rental market.

44.     In Portland, building a QTA sufficient to service all of the car rental brands closer to the airport terminal is not reasonably feasible because it is prohibitively expensive, restricted by zoning, not conveniently accessible, or there is not sufficient land available.

45.     Approximately every five years, the Portland airport re-assigns the car rental facility space by conducting a bidding process, awarding the five on-site facilities to the five highest bidders.  During the bidding process, each brand must submit a separate bid for each counter.  Thus, Enterprise Holdings must submit separate bids for its Enterprise, National and Alamo brands; Avis/Budget must submit separate bids for Avis and Budget; and all other firms submit a single bid for the brand it operates.  The proposed merger would increase defendants' unfair competitive bidding advantage by allowing Avis/Budget-Dollar/Thrifty to control the bidding of three separate brands.  As a result of the merger, two firms would control six of the eight bids submitted.

46.     The airport car rental market at the Portland International Airport consists of the following firms and market shares:

- Avis/Budget (operating Avis and Budget brands) – 27%
- Hertz (operating Hertz brand) – 26%
- Enterprise Holdings (operating National, Alamo and Enterprise brands) – 26%
- Plaintiff Todd(operating the Dollar brand) – 13%
- Dollar/Thrifty (operating the Thrifty brand only) – 7%

47.    The Portland International Airport car rental market is highly concentrated, with an HHI of approximately 2300.

48.    At the Seattle-Tacoma International Airport, each of the eight major brands, plus Advantage (owned by Hertz) and Fox (independent) are in operation.  Plaintiff CMC, which operates the Dollar brand, is the only independent franchisee operating at the Seattle-Tacoma airport; all other brands are operated by the Avis/Budget, Dollar/Thrifty, Enterprise Holdings and Hertz corporate stores.

49.    There are nine available car rental counters inside the baggage terminal at the Seattle-Tacoma airport, and each is occupied by one of the eight major brands, plus Advantage.  However, only five brands – Alamo, Avis, Budget, Hertz, and National – have parking stalls located within walking distance of the terminal.  The other four brands – Enterprise, Thrifty, Advantage, and Dollar (operated by plaintiff CMC) – have counters in the terminal but parking stalls located miles away, reachable only by shuttle bus.  Fox has both counter space and parking stalls located away from the terminal.

50.    The firms with counters in the terminal but cars located miles away are at a distinct competitive disadvantage to those with both counters and cars close to the terminal.  Four of the five firms with cars located away from the terminal have the lowest market shares in the market.

51.     The airport car rental market at the Seattle-Tacoma
International Airport consists of ten brands, owned by the following firms
with the following market shares:

- Enterprise Holdings (operating National, Alamo and Enterprise brands) – 33%
- Hertz (operating Hertz and Advantage brands) – 27%
- Avis/Budget (operating Avis and Budget brands) – 26%
- Dollar/Thrifty (operating the Thrifty brand only) – 6%
- Plaintiff CMC (operating the Dollar brand) – 6%
- Fox (operating the Fox brand) – 3%

52.     The Seattle Tacoma International Airport car rental market is
highly concentrated, with an HHI of approximately 2580.

53.     The barriers to entry in the Seattle-Tacoma and Portland
airport car rental markets are high.  Both airports have very limited facility
space, including customer service counters, parking stalls, and service areas
necessary for de novo entry.  The investment necessary to successfully bid on
and obtain on-airport facilities would make operating a single-airport market
car rental firm unprofitable.  The lack of a national presence of a single-
airport de novo entrant would prevent the entrant from attracting a sufficient
number of customers necessary to be profitable.  Avis/Budget, Dollar/Thrifty,
Hertz and Enterprise Holdings will not authorize new franchisee agreements
in the Seattle-Tacoma or Portland international airports.  As evidenced by
the low market shares of firms such as Fox, establishing a car rental firm
with facilities only reachable by shuttle bus will not enjoy sufficient market
penetration to prevent incumbent oligopolists from profiting by at least small
but significant non-transitory price increases.

54.     The markets for airport car rentals in the Seattle-Tacoma and Portland areas are lines of commerce and relevant product and geographic markets within the meaning of Section 7 of the Clayton Act.

**Seattle-Tacoma and Portland Used "Program Car" Markets**

55.     An essential aspect of the car rental business is the regular purchase and sale of vehicles.  The ongoing process of buying and selling vehicles allows car rental companies to maintain newer, low-mileage vehicles within their fleets and to manipulate the size of their fleets in response to seasonal demand.

56.     When stocking their fleets, car rental firms purchase either "program vehicles" or "risk vehicles."

57.     New "program vehicles" are subject to agreements requiring the manufacturers to repurchase the vehicles from the car rental companies at pre-determined prices or to guarantee a rate of depreciation during a specified time period.  These program agreements set forth various conditions relating to maintenance, maximum mileage usage and other conditions. After repurchase, the car manufacturers sell the used program cars to used car dealers.

58.     Used program cars are only sold at automobile auctions closed to the public.  The public is unable to purchase used program cars directly from the car manufacturers.

59.     "Risk vehicles" are not covered by program agreements requiring manufacturer repurchase.  Risk vehicles are cars that the car rental company is itself responsible for selling in the used car market.

60.     Because of the agreements under which the manufacturer repurchases program cars, used program cars are late-model vehicles, generally six to twelve months old, with very low mileage, and in excellent condition.  Because they are resold as used within months of production, most program cars are still under factory warranty when resold.

61.     Due to a phenomenon specific to cars, a new car loses a substantial amount of its value the moment it is driven off the new car lot and becomes "used."  As a result, the difference in price between a new car and a used program car of the same make, model and year is generally substantially greater than the difference in quality, mileage and condition between the two.

62.     Used program cars are substantially differentiated from other used cars by quality, warranty, condition, and price.  Other used cars, including risk cars, taxi cabs, police cars, corporate cars and other used fleet vehicles are not reasonable substitutes for used program cars because the former are too old, of prohibitively lower quality, have prohibitively high mileage, require prohibitively expensive alterations, and/or are unavailable in sufficiently high quantity.

63.     Neither the price of new cars, nor the price of other used vehicles sold at auction significantly influences or constrains the price of used program and risk cars.  Buyers of used program cars are unlikely to reduce their purchases in response to a small but significant and non-transitory increase in price to a degree that would make such a price increase unprofitable.

64.     Avis/Budget, Dollar/Thrifty, Enterprise Holdings, and Hertz are the only firms producing late-model, well-conditioned, low-mileage, high resale value used program cars suitable for car rental fleets like plaintiffs'.

65.     Used program cars previously owned by Avis/Budget, Dollar/Thrifty, Enterprise Holdings and Hertz are marketed and sold in the metropolitan areas of Seattle-Tacoma, Washington and Portland, Oregon.

66.     Avis/Budget sold approximately 350,000 vehicles in 2009.

67.     Historically, over 95% of the vehicles purchased by Avis/Budget are program cars.  However, beginning in approximately 2006, Avis/Budget began temporarily decreasing the ratio of program cars to risk cars purchased.  Of all vehicles purchased by Avis/Budget in 2006, 88% were program cars (and 12% were risk); in 2007, 73% were program cars (and 27% were risk); in 2008, 58% were program cars (and 42% were risk); in 2009, 55% were program cars (and 45% were risk).

68.     Avis/Budget decreased the percentage of program cars purchased from 2006 to 2009 as a direct result of the financial crisis which ultimately lead to General Motors and Chryslers' bankruptcy filings.  In decreasing the percentage of program cars purchased, Avis/Budget sought to decrease the credit risk associated with the program agreements' manufacturer buy-back provisions.

69.     Dollar/Thrifty sold approximately 100,000 vehicles in 2009.

70.     Historically, 75% to 80% of the vehicles purchased by Dollar/Thrifty are program cars.  Beginning in approximately 2005, Dollar/Thrifty began temporarily decreasing the ratio of program cars to risk cars purchased.  Of all vehicles purchased by Dollar/Thrifty in 2004, 82%

were program cars (and 18% were risk); in 2005, 72% were program cars (and 28% were risk); in 2006, 68% were program cars (and 32% were risk); in 2007, 55% were program cars (and 45% were risk); in 2008 35% were program cars (and 65% were risk); and in 2009, 95% were program cars (and 5% were risk).

71.     Dollar/Thrifty decreased the percentage of program cars purchased from 2005 to 2009 as a direct result of the financial crisis which ultimately lead to General Motors and Chryslers' bankruptcy filings.  In decreasing the percentage of program cars purchased, Dollar/Thrifty sought to decrease the credit risk associated with the program agreements' manufacturer buy-back provisions.  The bankruptcy of General Motors (from which Dollar/Thrifty purchases the large majority of vehicles) had a significant impact on Dollar/Thrifty's increase in the percentage of risk cars purchased from 2005 to 2009.

72.     The United States automobile manufacturing industry is rebounding.  Demand for vehicles produced by Ford, Chrysler and General Motors is increasing.  Ford Motor Company has had six straight profitable quarters and posted record profits for the third quarter of 2010.  In October, 2010, Chrysler vehicle sales increased 37% from the previous year and marked the seventh straight month of sales gains.  In early November, 2010, General Motors raised over $20 billion in the second-largest initial public offering in United States history.

73.     Avis/Budget's three-year decrease in the percentage of program cars purchased was temporary.  Beginning in 2010 or 2011, Avis/Budget will begin increasing the percentage of program cars purchased and anticipates

continuing to increase the percentage of program cars purchased in the near future.

74.    Dollar/Thrifty's four-year decrease in the percentage of program cars purchased was temporary.  Beginning in 2010 or 2011, Dollar/Thrifty will begin increasing the percentage of program cars purchased and anticipates continuing to increase the percentage of program cars purchased in the near future.

75.    Based on Avis/Budget and Dollar/Thrifty's historic and likely future program car purchases, the used program car market in the United States is as follows:

- Enterprise Holdings (approx. 200,000 used program cars sold) – 34%
- Avis/Budget (approx. 167,000 sold) – 29%
- Hertz (approx. 113,000 sold) – 19%
- Dollar/Thrifty (approx. 100,000 sold) – 17%

76.    On information and belief, the market shares in the Seattle-Tacoma and Portland used program car markets is the same or similar to the market shares in the United States used program car market.

77.    The used program markets in Seattle-Tacoma and Portland are highly concentrated with an HHI of approximately 2650.

78.    The markets for used program cars in the Seattle-Tacoma and Portland areas are lines of commerce and relevant product and geographic markets within the meaning of Section 7 of the Clayton Act.

## LIKELY ANTICOMPETITIVE EFFECTS

79.     If the proposed acquisition were permitted to proceed, the already highly concentrated United States airport car rental market would become extraordinarily concentrated.  The proposed acquisition would produce an HHI increase of 690 and a post-acquisition HHI of approximately 3320.  Moreover, the merged firm of Avis/Budget-Dollar/Thrifty would control 41% of the market; the top two firms in the industry would control 72% of the market; and the top three firms would dominate the market with 98%.

80.     The post-merger concentration levels in the Seattle-Tacoma and Portland airports would similarly damage competition in those markets.  The merger would increase the HHI in the Portland airport market by 380 index points, resulting in post-merger concentration of 2680 HHI, with Avis/Budget-Dollar/Thrifty controlling 34% of the market, Hertz and Enterprise each controlling 26%, and plaintiff maintaining a 13% market share.  If, as is likely, the merger were to lead to the elimination of the plaintiff as a competitor, Avis/Budget-Dollar/Thrifty would absorb plaintiffs' market share and the Portland market HHI would jump another 880 index points to an HHI of 3560.

81.     The proposed merger will increase the HHI in the Seattle-Tacoma market by 310 points to an HHI of 2890.  If the merger were to lead to the elimination of plaintiffs as a competitor, which is likely, the HHI would increase another 380 points to 3270.

82.     These post-merger concentration levels will increase the likelihood that the resultant oligopoly will coordinate its market pricing, either expressly or tacitly, resulting in higher prices, lower product and service quality, and overall diminished consumer welfare.

83.    Avis/Budget utilizes a sophisticated computer software program, called Wizard, to increase Avis/Budget's ability to respond quickly to rental rate changes in the marketplace.  Avis/Budget has developed sophisticated computer systems to gather and report competitive industry rental rate changes every day.  This system automatically scans rate movements and reports changes to a dedicated staff of Avis/Budget pricing analysts for evaluation.  The system greatly enhances Avis/Budget's ability to gather and respond to rate changes in the marketplace.

84.    Avis/Budget's Wizard system also closely tracks supply and demand in the marketplace – including competitor supply – and recommends supply levels that will most closely approximate monopoly market pricing.

85.    Both Hertz and Enterprise have similar systems which allow the companies to closely track changes in market pricing and supply levels. These systems, including Avis/Budget's Wizard system, dramatically increase the ability of the car rental firms to coordinate increases in price and reductions in available supply.

86.    The proposed acquisition would lead to greater concentration in an already highly concentrated used program car market.  The proposed acquisition would increase the HHI in the Seattle-Tacoma and Portland markets from 2650 to 3630, an increase of 980 points.  The merged Avis/Budget-Dollar/Thrifty would control 46% of the market and the top two firms would control 80%.  Even if – as is expected – the merged Avis/Budget-Dollar/Thrifty cut the number of program cars it purchased (and therefore sold as used) by, for example 50%, the proposed combination would still result in a highly concentrated market of 3540.  These levels of concentration

are likely to lead to lower available supply and therefore higher prices, resulting in damage to competition in the market.

87.    In the past three to four years, as the number of used program cars available for purchase has decreased, the price of used program cars has steadily increased.

88.    The proposed merger is likely to result in the relative decrease in the number of used program cars sold by Avis/Budget and Dollar/Thrifty, as the firms reduce supply in order to put upward pressure on car rental prices.  This relative decrease in the number of program cars available will increase prices to the detriment of both used car dealers and used car consumers.

89.    Furthermore, in each of these markets, the direct competition between the Avis, Budget, Dollar and Thrifty brands will be eliminated.

90.    Avis/Budget and Dollar/Thrifty are significant rivals.  They are two of only four firms in the markets alleged, and they control brands that compete for business directly against one another.

## PLAINTIFFS' THREATENED INJURY

91.    James Cassan is a consumer in the United States airport car rental market, regularly renting vehicles from both the Dollar and National car rental brands at airports throughout the United States.  The high level of market concentration created by the proposed merger will facilitate and is likely to lead to tacit collusion among the market participants on prices, service quality and availability of supply throughout the market.  As a regular consumer of products within this market, Cassan is threatened with

increased prices, lower product and service quality, and diminished consumer choice.

92.     Plaintiff Cassan Enterprises is a consumer in the Seattle-Tacoma and Portland used program car markets, purchasing for lease to Todd and CMC and for ultimate resale on its used car lots, between 500 and 800 used program cars annually.

93.     In order to fluctuate its fleet size to meet seasonal demand and maintain a new, excellent-condition, lower-mileage fleet, Cassan Enterprises buys and sells thousands of cars per year, including new program cars, new risk cars and used program cars.

94.     Plaintiffs' franchise agreements require them to maintain car rental fleets of current model year vehicles or vehicles not more than one model year older than the current model year.  Plaintiffs are required to use the makes and models of vehicles recommended by Dollar/Thrifty.  Among other brands, Dollar/Thrifty requires plaintiffs to keep Ford, Chrysler, and General Motors vehicles in their fleet.

95.     Ford, Chrysler and General Motors require large-volume purchases for new program cars.  Since plaintiffs are unable to meet the minimum volume purchases, they are unable to buy new program cars from Ford, Chrysler, or General Motors.  Instead, plaintiffs must purchase these brands as used program cars.

96.     The purchase of used program cars is essential to the operation of plaintiffs' business.  Generally, used program cars replace older vehicles within plaintiffs' fleet.  These older vehicles are then sold at retail from

plaintiffs' used car lots.  A large portion of plaintiffs' revenues are derived from the sale of used program cars formerly part of plaintiffs' car rental fleet.

97.    Plaintiffs lack the capital to maintain a fleet of only new cars, so in order to conduct their business, they must purchase used program cars.

98.    The suppliers of used program and risk cars are Avis/Budget, Dollar/Thrifty, Hertz and Enterprise, and all of the used program cars purchased by Cassan Enterprises are formerly owned by one of these four major car rental firms.

99.    The high level of market concentration created by the proposed merger will facilitate and is likely to lead to collusion among sellers in the used program car market, resulting in lower supply and higher prices. Moreover, there is a strong likelihood that, post-merger, the Avis/Budget-Dollar/Thrifty combination will merge their fleets, significantly reduce the number of vehicles in their fleets and reduce the number of program cars purchased – or reduce the number of program cars expected to be purchased by Avis/Budget and Dollar/Thrifty – resulting in fewer used program cars available for sale and higher prices for used program cars.  As consumers of used program cars, plaintiffs will suffer injury in the form of higher prices and fewer consumer options.

100.    Plaintiffs Cassan Enterprises, Todd, and CMC are competitors in the Seattle-Tacoma and Portland airport car rental markets and the proposed merger threatens their elimination from these markets.

101.    The post-merger structure of the markets gives Avis/Budget, and the other market incumbents, a strong incentive to terminate plaintiffs as price competitors.  If the proposed merger were permitted, Avis/Budget

would become market dominant in Portland, with 34% of the market, eight percentage points higher than both Hertz (26%) and Enterprise Holdings (26%).  If plaintiffs were eliminated from the Portland market, plaintiffs' franchise would revert to Avis/Budget-Dollar/Thrifty, which would install a company-owned Dollar rental facility and absorb all of plaintiffs' 13% market share.  In that case, Avis/Budget-Dollar/Thrifty would control 47% of the market and the only remaining competitors, Hertz and Enterprise Holdings, would each control 26% – a market concentration of 3620 HHI.  Similarly, if plaintiffs were eliminated from the Seattle-Tacoma market, Avis/Budget-Dollar/Thrifty would control 38% of the market, Enterprise Holdings would control 33% and Hertz 27%, establishing a highly concentrated market of 3220 HHI.  This Avis/Budget-Dollar/Thrifty market dominance, combined with the highly-concentrated oligopolies created in the Portland and Seattle-Tacoma markets, would allow Avis/Budget, as well as Hertz and Enterprise Holdings, to substantially lower available supply and increase price.

102.   Given the incentives to achieve these results, there is a high likelihood that the market incumbents Avis/Budget-Dollar/Thrifty, Hertz and Enterprise Holdings will increase their facility bids in the Portland and Seattle-Tacoma markets to levels equal to an amount below an appropriate measure of their costs with the purpose and intent of driving plaintiffs out of the market, later recouping more than their predation investment.

103.   If the plaintiffs are unsuccessful in obtaining an on-airport facility in either the Seattle-Tacoma or Portland markets, there is a strong likelihood that plaintiffs' business will fail in those markets.

104.   Moreover, given the incentives to achieve the market concentration levels indicated above, there is a high likelihood that the

merged Avis/Budget-Dollar/Thrifty entity would take actions to undermine plaintiffs' business operations, including: diverting or poaching reservations from the Dollar website and telephone call center, increasing franchise fees, and other conduct aimed at thwarting plaintiffs' business.  It is further likely that the merged entity will price its products at predatory levels below an appropriate measure of its costs with the intent of eliminating plaintiffs as a competitor, absorbing plaintiffs' market shares and later recouping more than its predation investment.

105.   If the proposed merger were consummated and plaintiffs were forced to close business in the Seattle-Tacoma and/or Portland markets, Avis/Budget-Dollar/Thrifty would very likely take over plaintiffs' business, setting up a corporate-owned Dollar-Rent-A-Car location in its place.

106.   Avis/Budget has strong financial resources, a car rental fleet of over 350,000, managerial and operational expertise in renting cars, and sufficient excess capacity to absorb all of plaintiffs' market shares in both the Seattle-Tacoma and Portland markets.

107.   The predation period required to force plaintiffs out of the market would be relatively short.  In the event market participants were to drive plaintiff from the markets by predatorily increasing their bids to levels below their costs, the successful predation would be immediate.  If the merged Avis/Budget-Dollar/Thrifty entity sought to eliminate plaintiffs through predatory pricing or other conduct, the length of time necessary to eliminate the plaintiffs would be substantially less than the time necessary to recoup the predation investment.

108.   There is a likelihood that the predatory scheme would cause a rise in prices above a competitive level sufficient to compensate Avis/Budget-

Dollar/Thrifty as well as market incumbents Hertz and Enterprise Holdings.
If plaintiffs' companies are eliminated from the market, their 13% market
share in Portland and 6% market share in Seattle-Tacoma will be absorbed
by Avis/Budget-Dollar/Thrifty.  Moreover, without plaintiffs' price
competition, the resultant highly-concentrated oligopoly will likely increase
prices above competitive levels, benefitting all of the incumbent market
participants.  Because the market barriers are so high as to preclude de novo
entry, the recoupment period would be uninterrupted and relatively long in
duration.

## ABSENCE OF COUNTERVAILING FACTORS

109.   Responses from Enterprise Holdings or Hertz – the only
remaining competitors in the markets – will not prevent the likely
anticompetitive effects from occurring.  Competition from new entrants will
not likely reduce the anticompetitive effects alleged.  Barriers to entry in the
relevant market, including, e.g., the costs associated with purchasing and
servicing a fleet of vehicles at each of the major airports, will likely prevent
de novo entry (but would not prevent entry into new geographic markets by
existing competitors) and are insufficiently low to prevent a small but
significant and non-transitory price increase from being profitable.

110.   The anticompetitive effects alleged will not be lessened by any
efficiencies achieved by the acquisition.

## VIOLATION ALLEGED

111.   Plaintiffs hereby incorporate by reference paragraphs 1 through
110.

112.    The proposed acquisition of Dollar/Thrifty by Avis/Budget would likely substantially lessen competition in interstate commerce in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 in that it would eliminate actual and potential competition between Dollar/Thrifty and Avis/Budget in each of the relevant markets, and competition in each of the relevant markets would be substantially lessened.  The merger will likely irreparably harm plaintiffs in the form of higher prices, lower product and service quality, diminished customer choice, and the elimination or retardation of plaintiffs' viability as competitors.

## <u>JURY DEMAND</u>

113.    In the event of trial and to the extent available under law, plaintiffs hereby demand a jury.

## **PRAYER FOR RELIEF**

Plaintiffs pray for the following relief:

A.     That the proposed acquisition alleged herein be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

B.     That defendants be preliminarily and permanently enjoined and restrained from completing the proposed acquisition or from entering into any agreement the effect of which would be Avis/Budget's acquisition of Dollar/Thrifty or any of its subsidiaries;

C.     That plaintiffs be awarded costs of suit, including a reasonable attorneys' fee, as provided by 15 U.S.C. § 26; and

D.     That plaintiffs have such other and further relief, including but not limited to an order requiring defendants to hold their assets separately pending final disposition, an order of divestiture to remedy the anticompetitive effects created by a completed merger, and any other further relief as the Court may deem just and proper.


November 30, 2010                    Respectfully submitted,


                                         s/    John J. Houlihan, Jr.
                                     John J. Houlihan, Jr.


Joseph M. Alioto                     John J. Houlihan, Jr. (SBN 30285)
Joseph M. Alioto, Jr.                **HOULIHAN LAW**
**ALIOTO LAW FIRM**                  3401 Evanston Avenue North, Suite C
555 California Street                Seattle, Washington 98103
Thirty-First Floor                   Telephone: (206) 547-5052
San Francisco, California 94104      Facsimile: (206) 547-1958
Telephone: (415) 434-8900            Email: John@Houlihan-Law.com
Facsimile: (415) 434-9200
JAliotoJr@AliotoLaw.com

Theodore F. Schwartz
Kenneth R. Schwartz
**LAW OFFICES OF THEODORE F.
SCHWARTZ**
230 South Bemiston, Suite 770
Clayton, Missouri 63105
Telephone: (314) 863-4654
Facsimile: (314) 862-4357
Theodore@Schwartz-Schwartz.com

*Attorneys for Plaintiffs*

# EXHIBIT A

# U.S. Airport Market Share - Major Car Rental Brands
## Pre-Merger*



* Source: 2009 Hertz Annual Report

# EXHIBIT B

# U.S. Airport Market Share – Major Car Rental Firms
## Pre-Merger vs. Post-Merger*



*Source: Avis Budget Group Presentation to Investors, March 25, 2010*

# EXHIBIT C

# HHI Comparison: Pre-Merger vs. Post-Merger
## U.S. Airport Market Share, 2009



# EXHIBIT D

# Origins of U.S. Car Rental Companies
## History of Mergers and Acquisitions

